## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:05CR339

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **ROYRE ERVIN,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER IS BEFORE THE COURT** in accordance with 28 U.S.C. § 636(b),

on the defendant's "Motion to Suppress Statements and Firearm Obtained in Violation of the

Fifth and Sixth Amendments and Request for Evidentiary Hearing" ("Motion to Suppress")

(Document No. 44), filed on November 18, 2005. The United States filed a timely Response

in Opposition to the Motion to Suppress (Document No. 53) on December 15, 2005.  The

Court conducted an evidentiary hearing on January 19, 2006, and heard oral arguments on

January 20, 2006.  The Motion to Suppress is now ripe for entry of the following findings,[1]

conclusions, and recommendation.

As set out in detail below, the defendant seeks to suppress both certain statements he

made to law enforcement officers and the fruit of a search conducted as part of the

---

[1]     The findings of fact herein are intended only to aid the decision process and
expedite further review.  Such findings are not intended to be binding as to ultimate
issues left to the finder of fact at trial and are made in accordance with Rule 12(d),
Fed.R.Crim.P.

investigation. Because some of the defendant's statements were the result of custodial interrogation without Miranda warnings, those statements must be suppressed. Other statements made after Miranda warnings were given need not be suppressed, and the fruit of the search also should not be suppressed since the search was conducted pursuant to lawful consent. It is therefore recommended that the defendant's Motion to Suppress be **GRANTED** in part and **DENIED** in part.

<u>FINDINGS AND CONCLUSIONS</u>

I.      **Background**

On the afternoon of August 3, 2004, Marvin Clark was killed in what appeared to be a drug-related, drive-by shooting in the parking lot of the Greenbrier Apartments in east Charlotte. Detective Michael Burke of the Charlotte-Mecklenburg Police Department (hereinafter "CMPD"), Homicide Division, had just come on duty and was informed by another officer of the shooting. Burke was apparently assigned to be lead investigator in the case.

Burke arrived at the scene of the shooting at 4:30 p.m. After canvassing witnesses, CMPD detectives learned that there were two vehicles possibly involved in the shooting: a blue Cadillac from which the shots were purportedly fired, and an older model gray Oldsmobile. Detectives also determined that as many as four male individuals were involved in the shooting. The witnesses' descriptions of the suspects were not detailed; however, witnesses did describe one suspect as an African-American male with long dreadlocks, and

another suspect as a taller African-American male. Witnesses stated that an African-American with long dreadlocks had been the shooter.

James Clark and Nicholas Taylor had been Marvin Clark's companions that afternoon, and had witnessed the shooting. The two men were transported to the Law Enforcement Center (hereinafter "LEC") to speak to detectives about what they had seen. James Clark referred to the suspect with dreadlocks by his street name of "Jailbird." James Clark (Marvin Clark's brother) further told the investigators that Marvin had engaged in a conversation on a cell phone with Jailbird shortly before the shooting occurred. James Clark had the cell phone in his possession, and he turned it over to the detectives.

After receiving the cell phone, detectives retrieved telephone numbers associated with recent calls. They obtained a phone number that James Clark believed belonged to Jailbird. After processing the crime scene, Burke returned to the LEC and ran the telephone number obtained from James Clark's cell phone against records in a database of various reports made to the CMPD. Burke learned that the cell number and account were associated with the residence located at 7 Village Green Drive in Charlotte.

Burke then contacted Detectives Valerie Gordon and Susan Manassah, who were attempting to procure a surveillance tape from a convenience store close to the Greenbrier Apartments. Gordon and Manassah were, like Burke, wearing civilian clothes and driving an unmarked car. Burke, who intended to "cold call" the cell phone number associated with 7 Village Green Drive, asked Gordon and Manassah to check out the address. After Gordon

3

and Manassah arrived at the address, they observed an older model gray Oldsmobile. The Oldsmobile was backed into a parking spot, so one detective exited the unmarked vehicle to check the license plate. After retrieving the tag number, Manassah ran the tag and found that it belonged on a Mazda, not an Oldsmobile. The detectives got back into their vehicle and parked some distance away so that they could observe the Oldsmobile.

Burke, who had remained at the LEC, placed the phone call to the telephone number corresponding to 7 Village Green Drive. A female, who identified herself as Beverly Batts, answered the phone. Burke identified himself to the woman and told her that he was investigating a homicide. Within moments of Burke placing that call, Gordon and Manassah observed two African-American men leave the apartment. One of the men wore dreadlocks pulled into a ponytail, and the other was taller. The detectives observed both men get into the Oldsmobile. The man with dreadlocks was later identified as Gregory Goodman. The man described to be taller was later identified as Royre Ervin (hereinafter "defendant").

The detectives observed that the defendant sat in the driver's seat and Gregory Goodman sat in the passenger seat. They drove away in the Oldsmobile. At this point in time, several hours had elapsed since the shooting. Gordon and Manassah, being in an unmarked vehicle not equipped to make a traffic stop, called for assistance from a marked

CMPD unit to make a "felony stop" on the Oldsmobile.[2]  CMPD Officer Torri Tellis responded and conducted the stop with the assistance of other officers.

Prior to making the stop, Tellis was informed for his own safety that the Oldsmobile was a vehicle possibly involved with a homicide and that one of the occupants was a homicide suspect.  Tellis stopped the Oldsmobile in the parking lot of a gas station at the corner of Milton Road and Sharon Amity Road in Charlotte.  Tellis commanded the occupants to exit the vehicle.  The defendant and Goodman complied and were placed in the back seat of separate marked units.  The defendant was placed in the back seat of Tellis' car, and Tellis testified that he had not told defendant he was under arrest.

Gordon testified that she then approached the defendant, who was secured in handcuffs in the locked back seat of Tellis' car.  She testified that she spoke to the defendant through an open window; however, Tellis testified that Gordon spoke to the defendant by opening the back door.  Gordon identified herself to the defendant as a homicide detective with the CMPD and informed him that she wished to talk to him in connection with a homicide investigation.  Gordon testified that she asked the defendant if he would come to

---

[2]     For the purposes of this hearing, it was undisputed that a felony stop involves the stop of a vehicle the occupants of which are considered to pose a high risk or an unknown risk to the officers stopping the car.  During a felony stop, the officers conducting the stop remain at a distance from the vehicle, weapons drawn.  The officers then order the occupants of the vehicle to exit the vehicle one at a time and walk to where the officers are standing.  After each occupant walks towards the officers, that occupant is handcuffed, checked for weapons and secured in the back of one of the responding patrol cars.  Typically, all occupants are separated into different patrol cars.

the LEC and speak to detectives voluntarily. Defendant asked "Do I have to?" Detective Gordon replied, "Either way, you are going to need to talk to me, whether under arrest or not, I need to talk to you."

After this exchange, the defendant told Gordon that he would come to the LEC. Gordon testified that the defendant asked her to get in touch with either his mother or his father. Gordon testified that she did not arrest the defendant at this point in time because, while she had probable cause to arrest him on some lesser offenses, she was investigating a homicide and did not have probable cause to arrest him for that crime.

At this point, Officer Tellis returned to his patrol car, where Gordon was speaking to the defendant. Gordon informed Tellis that the defendant had agreed to go to the LEC voluntarily in order to speak with investigators. At that time, Tellis removed the handcuffs from the defendant by leaning from the front seat into the back seat; however, defendant at no time was allowed out of the confines of the locked back seat of the patrol car.[3]

Without having any conversation with the defendant, Tellis transported him to the LEC, parked in a space marked for "Prisoner Delivery," and entered into a door marked "Prisoner Delivery." Having been in Tellis' custody for more than an hour, the defendant was escorted by Tellis through the LEC building at midnight to the second floor and placed in an interview room. Tellis waited outside the door of the interview room until he was

---

[3]     It is undisputed that an individual seated in the back of a patrol car is unable to open the doors of the patrol car from the inside.

relieved. Tellis testified that the interview rooms are located in a non-public area of the LEC. Each room is about nine feet by seven feet in size. There are no pictures, decorations, or phones in the interview rooms. Because civilians are not allowed to walk by themselves in the non-public areas of the LEC, Tellis testified that if the defendant had attempted to leave the interview room, he would have needed an escort.

Detectives Burke and Osorio arrived at the interview room sometime after midnight to interview the defendant. Both detectives were dressed in casual clothes and a tie, and displayed a mix of badges, identification, and sidearms. Burke and Osorio introduced themselves to the defendant and explained that they wanted to speak to him. Burke testified that he told the defendant that he was not under arrest, that the interview was a voluntary one, and that he was free to end the interview at any time. While the undersigned finds no reason to discredit this testimony, the Court does note that this advice was neither contemporaneously recorded by Burke nor referenced in the subsequent taped portions of the interview.

Over the next approximately eight hours, the defendant was interviewed concerning the homicide on the previous day. For purposes of analyzing the defendant's motion, the interview can be broken down into four distinct parts:

(1)    the first, lasting four hours, was the pre-interview, where the detectives questioned the defendant as to what he knew concerning the previous day's events;

(2)     the second, lasting a little less than two hours, was the tape-recorded interview or "statement" where the detectives interviewed the defendant based on the information he had related during the pre-interview;

(3)     the third was the recorded post-arrest interview, where the detectives first Mirandized defendant and then allowed him an opportunity to make an additional statement and asked questions based on information they had received from other detectives who had interviewed Gregory Goodman; and

(4)     the fourth was an unrecorded interview with the defendant concerning information provided by Montare Goodman, Gregory Goodman's brother.

## II.     Summary of the Interviews

### A.     The First Interview

Soon after the first interview began, Detective Burke offered the defendant water and a restroom break, both of which he declined. The defendant initially denied having any knowledge of or involvement in the shooting of Marvin Clark. He told the detectives that he had driven with his cousin to a convenience store located on Sharon Amity Road. The detectives told the defendant that the convenience store had a surveillance system. Defendant then stated that, after going to the convenience store, he drove into the Greenbrier Apartments to collect some money that his uncle owed him. He was unable to give the detectives the uncle's apartment number or address, however.

After further questioning, the defendant admitted that he had gone to the Greenbrier Apartments in order to conduct a drug transaction. He then stated that, after completing the transaction, he returned to his car and left the Greenbrier Apartments. As he was leaving, he stated he observed a blue vehicle drive into the complex. He continued to deny any knowledge of or involvement in the shooting.

Burke testified he took a break from the interview at about 1:30 a.m. and offered another water and a restroom break, which again was declined by the defendant. The defendant did not ask to leave the LEC. At about 4:00 a.m., Burke felt he had obtained as much information as possible from the defendant and asked him if he could tape-record his statement. Burke explained that he would like to get a recorded statement so that the defendant could recount the events in his own words. Burke testified that the defendant agreed.

### B. The Second Interview

At about 4:43 a.m, Burke began tape-recording the defendant's statement. Early in this tape-recorded statement, there was a discussion concerning whether the defendant had come to the LEC voluntarily. The defendant stated several times that he had not agreed to come to the LEC. For example:

OSORIO:    When you got stopped. Okay, now when the police stopped you . . . did they explain to you that we were . . . that the police was investigating . . . an incident that happened earlier today?

ERVIN:      Up to the point that they had me in cuffs about to bring me downtown, no. Nah, really, they just told me that they was like doing some research or whatever y'all call it.

| OSORIO: | An investigation? |
|---------|-------------------|
| ERVIN: | Investigation. |
| OSORIO: | Okay . . . did the officers ask you . . . if you would come down to the Law Enforcement Center . . . to talk to detectives about an incident that occurred earlier today? |
| ERVIN: | Umm . . . no. |
| OSORIO: | They didn't ask you? |
| ERVIN: | She just told me to ride since I didn't have license to work with her. |
| OSORIO: | . . . did they ask for your permission to come . . . did they ask if you would come down to the station and talk to detectives about the incident . . . about an incident that happened earlier today? |
| ERVIN: | No sir. They asked for my permission. I didn't give her no permission. |
| OSORIO: | Okay. Were you under arrest when you came down to the Law Enforcement Center? |
| ERVIN: | I got arrested at the scene. |
| BURKE: | You got handcuffed. |
| ERVIN: | And they handcuffed me. They handcuffed me. |
| OSORIO: | Okay. Were you asked to come down to the Law Enforcement Center to talk to detectives about an incident that occurred earlier today/ |
| ERVIN: | It wasn't no asked. Wasn't no asked. |
| BURKE: | Well, what was it? |
| ERVIN: | She told me since I didn't have a license that I need to come and talk to her. Asked her to call my dad or lawyers and she said we'll talk when we get down here. I still haven't seen . . . |

Defendant's Exhibit A, at 584-85.

At this point, the detectives and the defendant engaged in a discussion concerning whether anyone had told the defendant that he was under arrest, whether the handcuffs had been removed at any time, and who had informed the defendant that a man had been murdered. Id., at 585-87. After this discussion, they revisited the issue of whether the defendant had come to the LEC voluntarily.

| OSORIO: | Okay. And you agreed to come down and talk to us about . . . about this investigation. |
|---------|-------------------|
| ERVIN: | I didn't agree. |

BURKE:      Well how did you not agree?
ERVIN:      How did I not agree?
BURKE:      Umm . . . umm.
ERVIN:      She . . . she just told me I need to come down here and clear my name.

Id., at 588-89.

The interview continued.  At no point in the tape-recorded interview did the detectives advise the defendant that he was free to leave, that the door to the interview room was unlocked, and that they would provide him with transportation home if he did not want to continue.  Further, no mention was made of any inquiry during the first interview concerning voluntariness.  The recorded interview ended a little after 5:30 a.m.  Burke testified that based on the information that they had received at the conclusion of this second interview, CMPD did not have sufficient probable cause to arrest the defendant on homicide charges.

C.      The Third Interview

At approximately 5:45 a.m., after the completion of the tape-recorded interview, Burke left the interview room and was approached by Detective Manassah, who had been interviewing the defendant's passenger, Gregory Goodman, in a separate room.  Manassah told Burke that Goodman had directly implicated the defendant in the murder of Marvin Clark.

At this point, Burke felt certain that he had probable cause to arrest the defendant.  He returned to the interview room and placed the defendant under arrest for the murder of Marvin Clark.  He then read the defendant his Miranda rights.  At approximately 6:07 a.m.,

Burke presented the defendant with a typed form entitled "Adult Waiver of Rights", which the defendant executed. The defendant then made additional statements.

### D.    The Fourth Interview

Gregory Goodman was placed under arrest at about the same time. Cooperating with the detectives, Gregory Goodman called his brother, Montare Goodman, for the purpose of getting Montare to exit his apartment. As planned, Montare Goodman exited the apartment where he was located and was placed under arrest and taken to the LEC.

During an interview soon thereafter, Montare Goodman told CMPD investigators that he had obtained a .22 caliber rifle from the defendant before the shooting and that he returned it to the defendant after leaving the scene of the shooting. When Burke learned this information, he informed the defendant that Montare Goodman had given them information about the rifle. By this time, it was approximately 8:00 a.m., and the defendant agreed to continue to talk and informed Burke that he had placed the rifle in a bedroom closet at 9320 Edgevale Drive, which is the same address he listed on his "Adult Waiver of Rights" form.

The defendant signed a written consent to search form for the premises located at 9320 Edgevale Drive. CMPD investigators searched the premises located at 9320 Edgevale Drive and found under a bed a .22 caliber rifle with visible blood stains. Defendant was then transported to the intake center for processing.

### III.    Discussion

#### A.    The Requirements of <u>Miranda</u>

The Fifth amendment to the United States Constitution provides that no one "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court held in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), that this right was, at that point in time, in jeopardy of being effectively lost in the criminal justice system because

> coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.

<u>Id.</u>, at 435 (internal quotation marks omitted). To ensure the continued vitality of the constitutional privilege against self-incrimination, the Supreme Court held in <u>Miranda</u> that

> the admissibility in evidence of any statement given during <u>custodial</u> interrogation of a suspect would depend on whether the police provided the suspect with [<u>Miranda</u> warnings] . . . .

<u>Id.</u> (emphasis added).

<u>Miranda</u> does not, however, require police to warn everyone they question. <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). Instead, the <u>Miranda</u> warnings are only required "where there has been such a restriction on a person's freedom as to render him 'in custody.'" <u>Id.</u> Where it is shown that a defendant's statement is the product of a *custodial interrogation,*

it is the government's burden to show that <u>Miranda</u> warnings preceded the questioning which led to the statement.  <u>See</u> <u>Beckwith v. United States</u>, 425 U.S. 341 (1976).

In addition to <u>Miranda</u> warnings prior to questioning, there must also be a knowing and intelligent waiver of those rights for the subsequent statements to be admissible.  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  Once the right to counsel is properly invoked, a suspect in custody may not be questioned outside the presence of his or her attorney "unless the accused himself initiates further communication, exchanges, or conversations with the police."  <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

> Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," 451 U.S., at 484-485, 101 S.Ct., at 1884-1885--which means . . . that counsel must be present, *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). The *Edwards* rule, moreover, is *not* offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present.  *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

<u>McNeil v. Wisconsin</u>, 501 U.S. 171, 176-77 (1991) (citing <u>Edwards</u>, <u>supra</u>).

**B.     Motion to Suppress Statements Obtained During the First and Second Interviews**

The facts surrounding the defendant's initial arrest – or temporary custody as the government described it – are undisputed.  Acting pursuant to a command from CMPD detectives who had observed defendant and Gregory Goodman get into a car matching the description of one of the cars at the homicide scene, a felony stop of defendant's vehicle was conducted at approximately 11:00 p.m. on August 3, 2004.  In conducting the felony stop, Officer Tellis ordered defendant to exit the Oldsmobile at gunpoint, immediately placed handcuffs on defendant, and placed him in the backseat of the police vehicle, which was automatically locked.

Detective Gordon arrived soon thereafter.  At that time, defendant either knew or had been told that he had been stopped for operating the vehicle without a license, that the car had a fictitious tag, and that controlled substances had been found in the vehicle.  Gordon approached Tellis' vehicle and spoke to the defendant either through the window or by opening the door.  She then identified herself to the defendant as a homicide detective with the CMPD and informed him that she wished to talk to him in connection with a homicide investigation.  Gordon testified that she asked the defendant if he would come to the LEC and speak to detectives.  She stated that defendant asked "Do I have to?" and that she replied "Either way, you are going to need to talk to me, whether under arrest or not, I need to talk to you."  After this exchange, Gordon testified that the defendant told her that he would come

15

to the LEC voluntarily. After obtaining what she perceived to be consent, Gordon directed Tellis to remove the defendant's handcuffs. At no point, however, was the defendant released from the locked portion of the patrol car[4] or told that he was free to leave.

Tellis testified that he transported the defendant to the LEC without engaging in conversation. He parked the vehicle in a space marked for "Prisoner Delivery" and brought the defendant through a key-card secured entrance marked for "Prisoner Delivery." Pursuant to CMPD policy, Tellis escorted the defendant to the interview room and waited outside the room until he was relieved.

Detectives Osorio and Burke arrived soon thereafter. They had been informed that the defendant was on his way to the LEC voluntarily, but there is no evidence that Gordon communicated directly with Osorio and Burke. Further, there is no evidence that Gordon communicated to them the question the defendant had posed concerning any choice he may have had in the matter, her response, or the fact that the defendant was in handcuffs in a locked police car at the time of his inquiry.

Burke testified that during the first interview, he again went over with the defendant the fact that he had come to the LEC voluntarily. While the undersigned has no reason to doubt the testimony of Burke, there are no notes, recordings, or waivers in evidence which corroborate his testimony. There was no testimony concerning standard practices employed

---

[4]    Officer Tellis testified that he removed the handcuffs by leaning into the back seat from the front seat.

by the homicide unit, if any, to document a suspect's consent to an interview.  Further, the transcript of the second interview does not reflect that the detectives had independently discussed voluntariness with the defendant during the first interview.

The exchange between the detectives and the defendant during the second interview, recited at length above, suggests that the defendant was under the impression that he was compelled to come to the LEC for questioning.  Equally clear is the detectives' impression that the defendant had agreed with Detective Gordon to come to the LEC voluntarily.  It is undisputed that at no time from the point at which the defendant was removed from his car at gunpoint to the time of his arrest, some seven hours later, was he provided <u>Miranda</u> warnings.

The first issue is whether the defendant was in custody when the first and second interviews were conducted.  It is well-settled that,

> [t]wo discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

<u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (internal quotation marks and citation omitted).  In conducting the evaluation,

> [c]ourts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'

Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2149 (2004) (quoting Stansbury v. California, 511 U.S. 318, 322& 325 (1994)).

When viewed *in isolation*, no single factor present in this case would give a reasonable person in defendant's position reason to believe he was not free to leave during the interview. For example, a person can give valid consent while in handcuffs, United States v. Tyson, 360 F.Supp.2d 798, 806 (E.D.Va. 2005), while in the backseat of a patrol car, United States v. Perea, 374 F.Supp.2d 961, 979 (D.N.M. 2005), and even when facing a threat of imminent arrest. United States v. Jorgensen, 871 F.2d 725, 730 (8th Cir.1989).

When, however, the totality of the circumstances is considered, United States v. Boone, 245 F.3d 352, 362 (4th Cir. 2001), it is equally clear from the perspective of a reasonable person in the defendant's position that he was not at liberty to terminate the interrogation and leave. In addition to being in the back of a patrol car in handcuffs, having recently been placed there at gun point, the defendant was given a *Hobson's Choice* when he specifically asked Detective Gordon whether or not he had to consent. Gordon stated that "Either way, you are going to need to talk to me, whether under arrest or not, I need to talk to you." Based on the totality of the circumstances on that night, a reasonable person in the defendant's position would believe he was in custody.

Given that a reasonable person in the defendant's position would believe he was in custody, <u>Miranda</u> warnings were required before officers began custodial interrogation. It being undisputed that no <u>Miranda</u> warnings were provided before 6:07 a.m. on August 4, 2005, any and all statements obtained during the custodial questioning of the defendant during that period are, therefore, inadmissible in the government's case-in-chief. The undersigned will therefore recommend that such evidence be suppressed by the district court.

### C. Motion to Suppress Evidence Obtained During the Third and Fourth Interviews

At approximately 6:07 a.m. on August 4, after consulting with the detectives who had interviewed Gregory Goodman, Burke and Osorio placed the defendant under arrest and read him his <u>Miranda</u> warnings. Before any additional questioning began, the detectives secured an initialed and signed waiver of <u>Miranda</u> rights from the defendant. The third interview was thereafter commenced, during which the defendant made some additional incriminating statements. A fourth interview was conducted 90 minutes later, when the defendant was confronted with additional information obtained from Montare Goodman, who had further implicated the defendant in the shooting.

Thus, the next issue is whether any statements made during the third and fourth interviews should be suppressed as tainted by the unMirandized first and second interviews. When a Mirandized confession follows a Fifth Amendment violation, the Supreme Court in <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), held that

a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.

Id., at 318.  Thus, if the government can show that the unwarned questioning was uncoercive, then the presumption that the subsequent confession is tainted by the first does not apply and "the suspect's choice whether to remain silent should ordinarily be viewed as an act of free will." Id., at 311 (citation and corresponding quotation marks omitted).

While a "reasonable person" test is applied to determine whether a person was in custody, "coercion" or voluntariness "is determined from the perspective of the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  The Fourth Circuit has provided precise guidance on addressing Mirandized confessions that follow unMirandized confessions:

> Under *Elstad* then, the first question that must be answered. . .is whether the initial confessions were obtained in violation of Correll's Fifth Amendment rights--*i.e.,* whether they were involuntary--or whether the confessions were voluntary, but obtained in technical violation of *Miranda.*

Correll v. Thompson, 63 F.3d 1279, 1290 (4th Cir. 1995).

The question raised here is whether the defendant's statements during the first and second interviews were truly involuntary, or whether the statements were voluntary, but obtained in violation of Miranda. Put another way, were the statements the product of deliberate police misconduct or something more basic, such as miscommunication?  The undersigned finds from a preponderance of the evidence that the latter is far more likely. Gordon communicated to Osorio and Burke through the communications center that the defendant was on his way for a voluntary interview; she failed, however,  to communicate

to them the exact circumstances of her conversation with the defendant–circumstances that would lead a reasonable person to believe they had no choice in the matter. Osorio and Burke did not know that the defendant's consent was obtained while he was in handcuffs in the back of a patrol car that he was not allowed to exit at anytime before arriving at the LEC.

This apparent failure of communication left Osorio and Burke with what appears to be a good faith belief that the defendant was there to make a voluntary statement. Further, a review of the transcript of the second interview reveals that the detectives did not employ any improper coercion tactics.

A distinction is made in the case law between the "inherent coerciveness" of custodial questioning, see Miranda, supra, and the "coerciveness" that would make a subsequent warned statement after an unwarned statement invalid. In Elstad, Justice O'Connor stated that there is a "vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question . . . ." Id., at 312. Thus, the case law directs that coerciveness must be something more than routine custodial questioning.

When viewed from the perspective of this defendant, it is clear that his free will was never compromised by coercive questioning or other tactics. Further, the Court can find no problem with the length or hour of questioning.

> A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.

Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir.), cert. denied, 534 U.S. 924 (2001).

The Court has closely reviewed the transcript of the second and third interviews.  No threats or promises were made during the third interview.  Instead, Osorio simply stated that,

> OSORIO:    You've had a change of heart . . . and decided that you want to clear some issues that you left out of your first interview.   Is that right?
>
> ERVIN:     Yes sir.

Defendant's Exhibit C, at 648.  During the course of the third interview that followed, the defendant was allowed to tell his story.  The Court finds no evidence of coercion in the record, and any statements made by the defendant during the third and fourth interviews appear to have been completely voluntary.

 Even if the third interview had been coercive (which the Court expressly does not find), the timing of the information obtained from Gregory Goodman implicating the defendant, renders the defendant's subsequent statements independent.  Such intervening information makes the defendant's statements during the third and fourth interviews "an act independent of the [earlier] confession." Reck v.  Pate, 367 U.S. 433, at 440-41 (1961).  Clearly, the playing field had changed by the time of the third interview.  The defendant knew he had given the detectives little or no information in the first two interviews.  Defendant also knew that Gregory Goodman had implicated him.  This intervening charge

and its source provided the defendant with motivation not attributable to any lapse in free

will.

> In *Elstad,* the Supreme Court held that the government's initial failure to administer *Miranda* warnings can be cured by the subsequent administration of those rights. *Id.* at 309, 105 S.Ct. at 1293. The Court declared that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314, 105 S.Ct. at 1296. In such a case, the factfinder "may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* We have also upheld the admission of a defendant's Mirandized confession despite the government's failure to administer *Miranda* warnings prior to the defendant's initial on-the-street statements. *See Stawicki v. Israel,* 778 F.2d 380, 382-83 (7th Cir.1985). Significantly, in *Stawicki* we followed *Elstad* 's directive to focus on the voluntariness of the second confession--*i.e.*, the one made after the defendant waived his *Miranda* rights. *Id.* at 382.

United States v. Muhammad,120 F.3d 688, 697 (7th Cir. 1997).

In this case, the defendant's fourth interview was prompted by information provided

by Montare Goodman, who also implicated the defendant in the shooting.  This conversation

concerned the location of the .22 caliber rifle.  Montare Goodman allegedly stated during his

interview that the defendant had loaned him the .22 caliber rifle that was used in the shooting

and that he had returned the rifle to defendant thereafter.  There is no transcript of this

conversation in the record; however, there is also no evidence that the detectives used any

threats, promises, or improper tactics to garner this information from Montare Goodman.

When the detectives informed the defendant of Montare Goodman's confession, the

defendant agreed to continue to talk and quickly admitted that he had loaned the rifle to

Montare and had hidden it in his closet.

For all of the foregoing reasons, the Court recommends that the defendant's Motion to Suppress statements made during the third and forth interviews be denied inasmuch as the government has shown such statements to be both Mirandized and voluntary.[5]

**D.    Motion to Suppress Evidence Seized as a Result of the Search of Defendant's Home**

Defendant also seeks suppression of evidence discovered pursuant to the search of his home on August 4, 2004.  Based on the testimony, it would appear that a rifle consistent with that used to kill Marvin Clark, was discovered by detectives in the defendant's home underneath his bed.  It is undisputed that the search was conducted pursuant to a written consent to search executed by the defendant around 8:00 a.m. on August 4.

At the hearing, counsel for the defendant argued that any evidence seized during the search of the defendant's home should be suppressed as "fruit of the poisonous tree."  In Wong Sun v. United States, 371 U.S. 471 (1963), the origin of the "fruit of the poisonous tree" doctrine, the Supreme Court held that a confession preceded by questionable police activity must be suppressed at trial unless that confession was "an act of free will [sufficient] to purge the primary taint of the unlawful invasion." Id., at 486.  The defendant's argument

---

[5]    The undersigned finds defendant's reliance on Missouri v. Seibert, 542 U.S. 600 (2004), to be misplaced.  In Seibert, the Court considered whether a second Mirandized and recorded interview was tainted by a first unMirandized and unrecorded interview, and looked to whether the police officer's interrogation techniques were "designed to circumvent *Miranda*." Id., at 618.  In this case, however, it is clear that the interviewing detectives were not attempting to circumvent Miranda, but were instead operating under a good faith, albeit incorrect, belief that defendant was not in custody.  Once these officers believed defendant was in custody, they immediately read defendant his Miranda warnings.  Thus, Seibert is inapposite to this case.

24

that the evidence seized pursuant to the consent to search should be suppressed springs from

that doctrine.

The Fourth Circuit has expressly addressed the validity of a consent to search that

follows an earlier improper custodial questioning under the Fifth Amendment:

> We next address Boone's argument that his consent can never be deemed voluntary because it was procured while he was allegedly illegally detained. The Supreme Court has held that consent given while in custody may still be voluntary. *See United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Several Courts of Appeals have also held that consent can be voluntary even if it is procured during an illegal detention, provided that the totality of the circumstances confirms that the consent was not coerced. *See, e.g., United States v. Beason*, 220 F.3d 964, 966-67 (8th Cir.2000) (holding that even if Terry stop is illegal, consent can be an act of free will that purges initial illegality); *United States v. Guimond*, 116 F.3d 166, 170-71 (6th Cir.1997) (stating that inquiry into whether consent was in fact voluntary must be undertaken and that merely because consent was given during illegal detention does not automatically establish that consent was involuntary); *United States v. Thompson*, 106 F.3d 794, 798 (7th Cir.1997) (holding that consent to search given during illegal detention may be valid if State proves that consent was not coerced).

United States v. Boone, 245 F.3d 352, 362-63 (4th Cir. 2001)(footnote omitted).

The appropriate inquiry under <u>Boone</u> was recently discussed by the Eastern District

of Virginia in <u>United States v. Tyson</u>, 360 F.Supp.2d 798 (E.D.Va. 2005), which held as

follows:

> In determining whether a defendant's consent was voluntary, the critical inquiry is whether a defendant's consent to search was his own "essentially free and unconstrained choice" or whether his will was "overborne and his capacity for self-determination critically impaired." *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (*quoting Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041). This inquiry is based on an examination of the totality of the circumstances. *See Schneckloth*, 412 U.S. at 223-34, 93 S.Ct. 2041;

*Boone*, 245 F.3d at 361; *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir.1996). In assessing the totality of the circumstances, appropriate factors to consider include the characteristics of the accused (such as his age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). *Lattimore*, 87 F.3d at 650. While it is a relevant factor in the voluntariness inquiry that the defendant knew of his right to refuse consent, the government need not establish that the defendant knew of his right to refuse to prove that consent was voluntary. *Boone*, 245 F.3d at 362; *United States v. Brugal*, 209 F.3d 353, 362 (4th Cir.2000). Additionally, consent given while in custody may still be voluntary so long as the totality of the circumstances confirms that the consent was not coerced. *Boone*, 245 F.3d at 362-63 (*citing Watson*, 423 U.S. at 424, 96 S.Ct. 820).

Id., at 805.

Review of the Consent to Search form reveals that it was executed at 8:20 a.m., nearly two hours after the third interview ended around 6:30 a.m. There was no evidence that the detectives threatened that they would get a warrant to search the home or otherwise used any improper or overbearing tactics.

In considering voluntariness based on a totality of the circumstances, the Court has considered characteristics of the accused including his age, maturity, education, intelligence, and experience.[6] The Court has also considered the conduct of the officers. It would appear that little pressure was exerted on the defendant in obtaining the consent to search inasmuch as only minutes elapsed between the time detectives told the defendant of Montare Goodman's confession and the time he decided to grant consent to search. Close review of

---

[6] The undersigned notes that voluntariness requires a subjective review rather than the objective review required for determining whether a defendant was in custody.

the written consent reveals that the defendant was able to give the names and ages of others, mainly young children, who lived in his house.

Based on all the evidence presented, the defendant's consent to search was voluntary.

**E.     Invocation of the Right to Counsel**

It is undisputed that at the beginning of the second interview, the defendant stated to the interviewing detectives as follows:

> ERVIN:     She told me since I didn't have a license that I need to come and talk to her.  Asked her to call my dad or lawyers and she said we'll talk when we get down here.  I still haven't seen . . .

Defendant's Exhibit A, at 584-85.  At the hearing, neither side presented oral arguments as to whether this statement invoked the defendant's right to counsel.  The Court will briefly address whether such statement was sufficient to require police to stop not only the second interview, but also the subsequent interviews.  For reasons discussed below, the Court finds that the defendant's statement was not sufficient because it was not an unequivocal request for assistance of counsel during questioning.

In <u>Davis v. United States</u>, 512 U.S. 452, 460 (1994), the Supreme Court held that law enforcement officers who have given <u>Miranda</u> warnings may continue to question a defendant when a request for counsel is equivocal.  Specifically, the Supreme Court held that Davis's

> remark to the NIS agents-- "Maybe I should talk to a lawyer"--was not a request for counsel, and we see no reason to disturb that conclusion. The NIS agents therefore were not required to stop questioning petitioner . . . .

Id., at 462.  Likewise, in <u>Burket v. Angelone</u>, 208 F.3d 172, 198 (4th Cir.2000), the Fourth

Circuit held that

> Burket also contends that his Miranda rights were violated when he invoked his right to counsel by stating "I think I need a lawyer" and the police failed to cease the interrogation at that point.
>
> * * *
>
> For two independent reasons, Burket's claim fails.
>
> * * *
>
> Second, Burket's claim fails because, even if he was being subjected to a custodial interrogation at the time he stated "I think I need a lawyer," he did not invoke his right to counsel. . . . [T]o invoke the right to counsel and prevent further interrogation, a suspect must unambiguously request the assistance of counsel.
>
> * * *
>
> In this case, Burket said to the officers "I think I need a lawyer." This statement does not constitute an unequivocal request for counsel.

Id., at 197 -198 (citations omitted).

Finally, in <u>Mueller v. Angelone</u>, 181 F.3d 557 (4th Cir. 1999), the Fourth Circuit

addressed whether the defendant asking "'Do you think I need an attorney here?'" was an

unequivocal request for counsel.  In affirming the decision of the Supreme Court of Virginia,

the appellate court held that defendant

> could not prevail on a claim that his lone query whether his interrogator thought that counsel might be helpful constituted a clear assertion of his right to counsel. . . . The Supreme Court stated in <u>Davis</u> that it was "declin[ing] petitioner's invitation to extend <u>Edwards</u> and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney."  In declining to extend <u>Edwards</u> to cover such statements, the Court thus unambiguously confirmed that it had not in <u>Edwards</u> "clearly established" such a rule.

Id., at 573 -574 (citations omitted).

In this case, the defendant's statement that he earlier asked Detective Gordon "to call my dad or lawyers" is equally insufficient. First, the evidence is in conflict concerning what the defendant actually said since Detective Gordon testified that the defendant asked her to call his father or his mother. Even assuming the defendant's testimony to be true, it is not enough to trigger constitutional protections.

In England v. Commonwealth of Kentucky, 2005 WL 1185204 (Ky. 2005), the Kentucky Supreme Court held in light of Davis, as follows:

> In essence, England merely said that I guess you will have to call my lawyer and I don't know if I need my lawyer because I don't want to get into trouble. We hold that these statements do not rise to the level of impressing upon the interrogator that the suspect has requested an attorney before continuing the questioning. The statements were properly admitted at trial.

Id., at *2. In People v. Torres, 306 Ill.App.3d 301 (Ill.App. 1st Dist. 1999), the Illinois Appellate Division held, as follows:

> An accused's demand that a bystander contact an attorney on his behalf is not the equivalent of an explicit desire to speak with an attorney prior to questioning by police. In fact, this court has previously interpreted such a request to serve as an inquiry into a specific attorney's availability to handle the accused's case. Assuming that defendant asked Peterson to call his attorney, that request in no way communicated to the police officers that he wanted an attorney present before answering any questions. Accordingly, defendant's request did not constitute a successful invocation of his right to counsel.

Id., at 310 (citations omitted).

After considering all of the evidence presented, the undersigned thus finds under Davis and related case law that defendant did not make an unequivocal request for counsel.

Therefore, the Court will recommend that the defendant's motion to suppress on this basis also be denied.

## IV. RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED** that the defendant's Motion to Suppress Statements and Firearm Obtained in Violation of the Fifth and Sixth Amendments and Request for Evidentiary Hearing (#44) be **GRANTED** in part and **DENIED** in part , in the manner and for the reasons discussed above.

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this memorandum must be filed within ten (10) days after service of same. Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D. N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, Snyder, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is respectfully directed to send copies of this Memorandum and Recommendation to counsel for the parties and to Honorable Graham C. Mullen, United States District Judge.

Signed: March 23, 2006

David C. Keesler
United States Magistrate Judge